

Robert Tauler, Esq.
Tauler Smith LLP
626 Wilshire Blvd., Suite 510
Los Angeles, CA 90017
(213) 927-9270
rtauler@taulersmith.com

January 24, 2020

<u>**VIA ECF AND EMAIL**</u>

Honorable Katherine Polk Failla
US District Court
Southern District of New York
40 Foley Square, Room 2103
New York, NY 10007
Failla_NYSDChambers@nysd.uscourts.gov

Re:     ***Polaris Images Corp. v. ENTtech Media Group, LLC,*** Case No. 1:19-cv-08208,
        **Pre-Motion Conference**

Honorable Judge Failla:

I represent Defendant Enttech Media Group, LLC, in connection with this matter. Defendant intends to move to dismiss the First Amended Complaint filed by Rachel Dolezal (the "Dolezal Complaint"). I write to respectfully request a pre-motion conference seeking leave to file a motion to dismiss under Rule 12(b)(6) of all claims against Enttech, and to file a motion to strike Non-Party Nkechi Diallo aka Rachel Dolezal's Amended Complaint.

At the December 19, 2019 pre-motion conference regarding Plaintiff's motion to dismiss Polaris' original Complaint (the "Polaris Complaint"), the Court granted leave to Polaris to amend its Complaint. However, Polaris did not amend its Complaint. Instead, Polaris removed itself as plaintiff and added non-party Dolezal as the Plaintiff, alleging new facts that contradict the Polaris Complaint and the representations of counsel at the December 19, 2019 pre-motion conference, namely that Dolezal, not Polaris, has standing to sue. For the following reasons, Defendant seeks to file a motion to dismiss the Amended Complaint and a motion to strike non-party Dolezal's Amended Complaint.

**A.      Dolezal Lacks Standing to Sue For Copyright Infringement of the Subject Image.**

The Polaris Complaint alleged that Polaris was the "exclusive licensee" of the Dolezal and the Subject Image. By virtue of the exclusive license, Polaris is the only entity with standing to sue for infringement. *Fathers & Daughters Nevada, LLC v. Lingfu Zhang*, 284 F. Supp. 3d 1160, 1167 (D. Or. 2018), *mot. for relief from judgment denied*, No. 3:16-CV-1443-SI, 2018 WL 1855943 (D. Or. Apr. 18, 2018), *appeal dismissed*, No. 18-35430, 2018 WL 6131856 (9th Cir. Sept. 6, 2018)(citing *Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1170 (9th Cir. 2013)("[I]f a copyright owner grants an exclusive license of particular rights, only the exclusive licensee and not the original owner can sue for infringement of those rights."). "An exclusive license serves to transfer "ownership" of a copyright during the term of

the license." *Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1170 (9th Cir. 2013)(quoting 17 U.S.C. § 101). Since Polaris was the owner of the copyright because of its exclusive license, Dolezal lacks standing.

As Plaintiff's counsel made clear at the December 19th hearing, "Polaris and Ms. Dolezal entered into an exclusive licensing agreement on December 15th of 2017, and pursuant to that agreement any photographs that Ms. Dolezal provides to Polaris are subject to an exclusive license. So, what that means is that Polaris has the exclusive right to distribute or display those images to third parties." (Transcript, p. 3 (Exhibit A)). Polaris' counsel further articulated his knowledge of the law at the December 19th hearing, stating "if we [Polaris] have an exclusive license, we have standing to sue. That's the statute." (Transcript, Ex. A, p. 12). Despite the foregoing, the Amended Complaint not only abandons Polaris' theory of the case, it abandons Polaris altogether.

**B.     The Amended Complaint Should Be Stricken as an Improper Attempt by Non-Party Dolezal to Amend a Pleading.**

A party may move to strike an untimely or improper pleading, such as an amended complaint that improperly attempts to join additional parties. *See Cobell v. Norton*, 213 F.R.D. 42 (D.D.C. 2003); *Spencer v. Dixon*, 290 F. Supp. 531, 536 (D.C. La. 1968). The Dolezal Complaint should be stricken because it improperly adds a new party, replacing Polaris with Dolezal, without leave of Court, running afoul of various rules.

First, the Dolezal Complaint runs afoul of FRCP 15 which provides that only a party may amend a pleading. Thus, Dolezal did not have the right to amend the Polaris Complaint. Second, the Dolezal Complaint violates FRCP 21 requiring leave of Court. *See Spencer v. Dixon*, 290 F. Supp. 531, 535 (W.D. La. 1968)("Attempt to add additional parties fails where Amended Complaint contains no request for any order to add additional parties because Rule 21 of the Federal Rules of Civil Procedure requires that additional parties may be added or dropped from an action only on motion of any party and order of the court."). Third, a non-party may not participate in an action without filing a formal motion to intervene. *See Spangler v. Pasadena City Bd. Of Ed.*, 552 F.2d 1326, 1329 (9th Cir. 1977). See *Recht v. Metro Goldwyn Mayer Studio, Inc.,* No. CV 0806612 RGKMANX, 2008 WL 11409588, at *2 (C.D. Cal. Nov. 17, 2008)(Striking amended complaint as an improper attempt by a non-party to intervene in the action where a non-party amended a pleading.). Finally, Polaris failed to dismiss its case prior to filing the Dolezal Complaint. Dolezal should have filed a new case when Polaris dismissed itself as the sole Plaintiff.

For the foregoing reasons, Enttech respectfully requests a conference to set a briefing schedule for Enttech's motion to dismiss and motion to strike.

Respectfully submitted,

Robert Tauler, Esq.

# EXHIBIT A

Jcjdpolc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

POLARIS IMAGES CORPORATION,

                    Plaintiff,            New York, N.Y.

          v.                              19 Civ. 8208(KPF)

ENTTECH MEDIA GROUP LLC,

                    Defendant.

------------------------------x

                                          December 19, 2019
                                          10:35 a.m.

Before:

                    HON. KATHERINE POLK FAILLA,

                                          District Judge

                              APPEARANCES

LIEBOWITZ LAW FIRM, PLLC
     Attorneys for Plaintiff
BY:  JAMES H. FREEMAN
     RICHARD LIEBOWITZ

TAULER SMITH LLP
     Attorneys for Defendant
BY:  ROBERT TAULER

Jcjdpolc

1      THE CLERK:  In the matter of Polaris Images

2 Corporation versus ENTtech Media Group LLC.

3      Counsel, please state your name for the record,

4 beginning with the plaintiff

5      MR. FREEMAN:  Hi.  Good morning, your Honor.  James

6 Freeman, Liebowitz Law Firm, on behalf of the plaintiff.

7      MR. LIEBOWITZ:  Richard Liebowitz, Liebowitz Law Firm,

8 counsel for plaintiff.  Good morning, your Honor.

9      THE COURT:  Good morning to both of you.

10      To whom should I be directing my questions this

11 morning?

12      MR. FREEMAN:  I will be doing it, James.

13      THE COURT:  OK.  Yes, sir.

14      MR. TAULER:  Good morning, your Honor.  Robert Tauler

15 on behalf of defendant, ENTtech Media.

16      THE COURT:  OK.  Good morning to each of you.

17      This is our initial pretrial conference in this case,

18 and I believe, as well, it has become a premotion conference

19 because the defense has sought leave to file a motion to

20 dismiss.

21      Mr. Freeman, let me please begin with you.  Let's talk

22 about this case, and I would like to understand your view, sir,

23 on the interplay between licensing agreements that one may

24 have, Ms. Dolezal and Polaris, and, as well, what happens when

25 Instagram gets involved.

1    MR. FREEMAN:  OK.  Thank you, your Honor.

2         So Polaris and Ms. Dolezal entered into an exclusive

3    licensing agreement on December 15th of 2017, and pursuant to

4    that agreement any photographs that Ms. Dolezal provides to

5    Polaris are subject to an exclusive license.  So, what that

6    means is that Polaris has the exclusive right to distribute or

7    display those images to third parties.  Now --

8         THE COURT:  Just let me pause, please, so that I can

9    be sure I understand what you are saying.

10        I believe I just heard you to say that any image that

11   Ms. Dolezal provides to Polaris.  So, it is not images that are

12   being taken by Polaris representatives, its something where she

13   is providing the images?

14        MR. FREEMAN:  That is correct.

15        THE COURT:  Interesting.  OK.

16        MR. FREEMAN:  Yes, because she's the actual copyright

17   owner.  She is the copyright -- she is the registered copyright

18   claimant, so she owns the images.  But what she does is in

19   order to monetize those images, she engages Polaris to exploit

20   the images on her behalf, whether it be by securing the rights

21   for display or distribution in a magazine or online, because

22   she doesn't have time to do that herself.  So, that's

23   ordinarily why a photographer, or in this particular instance a

24   layperson, would engage a professional stock photography agency

25   to handle those duties.  So, that is exactly what happened

Jcjdpolc

1    here.

2              THE COURT:  OK.  Please continue, sir.

3              MR. FREEMAN:  So what they're arguing is that because

4    Ms. Dolezal posted the image to Instagram, that she essentially

5    violated her agreement with Polaris, because Polaris has an

6    exclusive right.  That may or may not be true, but the argument

7    that we made is that that is a dispute between Polaris and Ms.

8    Dolezal, that has nothing to do with defendant.  What defendant

9    is arguing is that Polaris doesn't have standing because Ms.

10   Dolezal violated, or potentially violated her exclusive

11   agreement with Polaris by posting it to Instagram, but that's

12   not here nor there as far as the defendant is concerned.

13             THE COURT:  All right.  But I guess I will ask the

14   defense this.  Am I looking forward to a situation where Ms.

15   Dolezal is impleaded as a third-party defendant in the case?  I

16   don't know.  I will ask that later on.

17             MR. FREEMAN:  I will delegate this.

18             THE COURT:  That is OK.  That is rhetorical, sir.

19             All right.  What else would you like me to know before

20   we turn to -- and I am going to hear from the defense first on

21   the issue -- the proposed or contemplated motion to dismiss?

22             MR. FREEMAN:  OK.  So there are three elements or

23   three components of their motion to dismiss --

24             THE COURT:  All right, and I will hear from you --

25             MR. FREEMAN:  So you just want to hear on the standing

Jcjdpolc

1   issue?

2           THE COURT:  I want to hear from you more on your case

3   before we start talking about their motion, if that makes any

4   sense.

5           MR. FREEMAN:  OK.  Understood.

6           So Polaris does have standing by virtue of the

7   exclusive agreement that they have with Dolezal.  The defendant

8   expropriated the photograph apparently from Instagram,

9   republished it on his commercial website without authorization

10  from either Ms. Dolezal or Polaris, and that forms the basis

11  for the infringement claim.

12          So, I could address the issues of fair use, or if you

13  want to --

14          THE COURT:  I will hear from you second on that --

15          MR. FREEMAN:  OK.  That is fair.

16          THE COURT:  Thank you.  OK.

17          All right.  Mr. Tauler, let me please hear from you,

18  sir.  Do you have a different understanding of the factual

19  circumstances that I was just discussing with Mr. Freeman?

20          MR. TAULER:  I do.  Today is the first day I learned

21  of the date of the licensing agreement.  It wasn't in the

22  complaint.  In fact, the complaint cites an exclusive licensing

23  agent relationship, nothing with respect to this specific

24  photo.  And that becomes important when you consider how this

25  photograph was created and disseminated.

1          It was disseminated on a platform, which I'm sure the

2     Court is aware of, called Instagram, which by virtue of posting

3     publicly on this platform, the user, the poster, in this case

4     the author, grants Instagram a license to publish that photo.

5     By simple virtue of providing another party a license to use

6     the photo, Polaris does not have an exclusive license ipso

7     facto.  And that was made clear in the <u>John Wiley</u> case, decided

8     just last year in the Second Circuit.

9          And as the Court is aware, there is only -- there are

10    only two types of claimants who could file lawsuits on behalf

11    of aggrieved parties under the Copyright Act, and those are the

12    owners, or those with exclusive rights.  And the <u>John Wiley</u>

13    case I think made clear that that right has to be 100 percent

14    of the bundle of rights.

15         And so I think that issue is dispositive.  I think

16    it's simple logic and math.  I have not seen this particular

17    issue with respect to Instagram and its licensure decided, and

18    I think that is partially because the Wiley and Sons case was

19    decided so recently.  But I do think that if -- in practical

20    terms, if you have a celebrity or someone who has gained

21    notoriety, at least, anyway, who is newsworthy sharing publicly

22    facts that are newsworthy and using this platform where the

23    image necessarily has to be embedded -- because of the

24    Instagram platform, you have to include a photograph -- it is a

25    simple fact of obtaining -- you could look at it as obtaining a

Jcjdpolc

1   license from Instagram itself.  This is something that is --

2   and this ties into some of the arguments we would like to make

3   in our motion, which is that this is plainly something provided

4   for public consumption.  And there is no market for this image

5   explicitly without the facts.  And they were republished by my

6   client strictly for the sake of accuracy and strictly for

7   public commentary, which in the article where this was

8   published there was other commentary from other folks around

9   the Web.

10          And so I think in this context it doesn't advance any

11  of the objectives of the Copyright Act in terms of advancing

12  the cultivation of artistry.  Rather, this is a public figure

13  posting something publicly, using a brand new medium, but I do

14  think that the Copyright Act is very clear that with respect to

15  standing, anyway, only two types of claimants can make claims,

16  and Polaris does not fit into either of those categories.

17          THE COURT:  Mr. Tauler, before you sit down, a couple

18  of questions for you, sir.

19          In the absence of Ms. Dolezal's publication of the

20  image on Instagram, would you agree that she and Polaris had an

21  exclusive licensing agreement?  You might say, actually, no, I

22  wouldn't because I haven't seen it yet, but there has been a

23  representation made to me this morning by an officer of the

24  court that such an agreement does exist.  So, I think I'm

25  understanding you to be saying to me that, all right, maybe

1    this agreement does exist, but the moment she posted that image

2    on Instagram Polaris lost its exclusivity, at least with

3    respect to that image.  Is that your argument?

4              MR. TAULER:  That is in my argument, your Honor.

5              THE COURT:  That is your argument, OK.  Now, I'm

6    neither agreeing nor disagreeing with that.  I just want to

7    make sure I do understand it.

8              You've argued two other things in your letter that I

9    think you might be on more tenuous ground.  On this point, I

10   don't know enough to know.  I think it might be a very

11   interesting issue -- I guess it will be in this case.  But on

12   the issue of the copyright registration or the timing of it, I

13   thought I understood that once the copyright was registered,

14   you could still claim copyright infringement for acts that

15   occurred prior to the registration.  Am I correct?

16             MR. TAULER:  That's correct, your Honor.  Perhaps this

17   was inartfully drafted in our letter, but, really, when you

18   look at the registration, the registration was done in July.

19   It was a single application registration, which under Section

20   202.3(b)(2)(B)(i), the registration must be owned solely by the

21   author.

22             THE COURT:  Yes.

23             MR. TAULER:  In other words, there cannot be joint

24   ownership or licensee agreement under that Code section if you

25   use this process.  And these regulations were just amended in

1   2017, and, again, some clarity was provided at the beginning of

2   this year.  And this would run into the same problem here with

3   respect to standing.  If she was -- if she is saying, using

4   that application, that she is the only owner, then Polaris

5   didn't own it at the time of the infringement.

6           And that's what ties into our second point, which is

7   that in order to -- my understanding is that in order to file a

8   copyright action, you must have had the copyright rights at the

9   time of the infringement.  But in either case, it would be --

10  that would be one way to frame the argument.

11          Another way to frame the argument would be to say that

12  Polaris doesn't have any copyright at all, that the copyright

13  is in fact invalid vis-a-vis Polaris.  Because, as I stated, if

14  you use this method, there is a representation being made by

15  the author, because she is taking advantage of this streamlined

16  process, without a delay period, that she is attesting that she

17  is the only owner and that no one else has rights in it, and I

18  think that's the argument we would be making in a motion to

19  dismiss.

20          THE COURT:  Your third argument is that of fair use,

21  and I'm amused by the fact that the John Wiley case to which

22  you have cited was my case originally.

23          MR. TAULER:  Right.

24          THE COURT:  I've also written on the fair use doctrine

25  in the Gossip Cop case.  I'm just not sure -- and you'll excuse

1 me for being so transparent about my skepticism -- that I can

2 make these determinations on a motion to dismiss.  I'm not

3 saying anything about motions for summary judgment, because

4 that will be far down the road.  But given what has been

5 alleged and given the fact that I will allow plaintiff's

6 counsel, if they wish, to amend their complaint, are you really

7 sure that this is a fruitful motion to dismiss?

8          MR. TAULER:  Well, it's something we would certainly

9 like to explore, because I do think in this situation -- and

10 I've served these cases in this circuit quite a lot; I do

11 understand that it is very difficult to win on a motion to

12 dismiss, and I fully acknowledge that fact, but I do believe

13 that given the nature of the filing, given the nature -- the

14 fact that the photograph is embedded in an Instagram post,

15 which in its very nature has to contain a photo, so the only

16 way to publish it would be also to produce the photo, that is a

17 fact that I don't think has been litigated, as far as I've

18 seen.  I think it's a new fact and deals with new circumstances

19 that I think could be addressed, and there is a very good

20 chance I would lose it but I think I could make it in good

21 faith.

22          THE COURT:  I'm not suggesting it is frivolous.  I

23 just want to make sure I understand and you understand the row

24 that you are about to hoe.

25          MR. TAULER:  Sure.

Jcjdpolc

1          THE COURT:  OK.  I appreciate that.

2          MR. TAULER:  And the other element of that, which I

3    touched upon earlier, is the marketplace for the photograph

4    itself.  One of the elements of whether fair use is met is

5    whether or not the use damages the marketplace for the image.

6    In this case, there is no market for the image but for news

7    reporting that would like to accurately report what Ms. Dolezal

8    said in this case.  So those two facts I think really stand

9    out.  With respect to the other elements, I understand what I'm

10   up against so --

11         THE COURT:  OK.  And it's still your -- you see the

12   reason we have this premotion conference, sir, is, first of

13   all, to give the plaintiff an understanding and an opportunity

14   to amend, if they so desire, but also to make sure that the

15   defense is, to use my parlance, hellbent on making this motion.

16         MR. TAULER:  Right.

17         THE COURT:  You are hellbent at this time?

18         MR. TAULER:  Yes, your Honor.

19         THE COURT:  OK.  You don't have to be.

20         MR. TAULER:  Well, I would like to.

21         THE COURT:  You would like to, all right.

22         MR. TAULER:  If the Court believes it would be a waste

23   of time, then I am happy not to.

24         THE COURT:  I'm telling you that I think you have some

25   difficulty on the registration issue and on the fair use issue

Jcjdpolc

1    in the context of a motion to dismiss.  I have not explored

2    with any great thought or inquiry the standing issue, I just

3    don't know.  But, again, the issue of whether -- let me say

4    this better.  It is the issue of the impact of the requirements

5    of Rule 12(b)(6) on what I must do.

6              MR. TAULER:  Correct.

7              THE COURT:  So I'm not sure I get to import all of

8    this knowledge about Instagram and its end-user licenses and

9    things of that nature in this context, but, you know, who

10   knows.

11             Let me take a moment, please, to hear from plaintiff's

12   counsel and then I will hear from you further.  Thank you.

13             MR. TAULER:  Thank you, your Honor.

14             THE COURT:  Mr. Freeman, I will hear from you in

15   response.  I presume you disagree with what defense counsel is

16   saying?

17             MR. FREEMAN:  Yes.  Thank you, your Honor.

18             So with respect to standing, I think we've already

19   addressed the issue.  I mean, if we have an exclusive license,

20   we have standing to sue.  That's the statute.  Opposing counsel

21   hasn't cited any regulation or legal authority which would hold

22   otherwise.

23             With respect to the second issue, the statute provides

24   that provided the copyright owner or the exclusive licensee has

25   a valid copyright registration prior to filing suit, then there

Jcjdpolc

1   is standing to sue.  So here we have a copyright registration

2   that is dated on July 20th.  The complaint was filed on

3   September 3rd.  I think that's the end of the issue.  I'm not

4   really tracking his logic on that issue.

5           THE COURT:  Well, it seems to me that I guess it goes

6   back to his first point.  If, for example, you haven't pleaded

7   an exclusive license, or if you had for a moment until the

8   picture was posted on Instagram, if somehow it had some legal

9   significance to the exclusivity of the license, then in theory

10  it might have some significance to the ability to register for

11  the copyright.  I'm not saying that's the case, but it would

12  seem to me that one and two are quite interrelated.

13          MR. FREEMAN:  Yes.

14          THE COURT:  And on three?

15          MR. FREEMAN:  OK.  And on three, on fair use, we

16  traveled this road quite often in this district.  And I think,

17  you know, the first factor is whether or not the secondary use

18  is transformative.  I know your Honor is quite familiar with

19  Gossip Cop, which sort of laid the foundation for many cases

20  since.  But the key element here is we look at Exhibit B to the

21  Complaint.  Essentially what you have is a picture of Rachel

22  Dolezal and a headline which says, you know, Rachel Dolezal is

23  coming out as bisexual.  OK.  So the article is about her being

24  bisexual.  What does that have to do -- I mean, they could have

25  used any photo, right, so the photo is interchangeable.

Jcjdpolc

1      THE COURT:  Fair enough.  But if she made the

2  announcement on Instagram, then it would make sense that one

3  would have the Instagram image with the statements about it.

4  Is that not what happened here?

5      MR. FREEMAN:  No.

6      THE COURT:  OK.

7      MR. FREEMAN:  What happened here was it looks to me

8  like they downloaded the photograph to their desktop and then

9  uploaded it to an article and recalibrated or reformatted it so

10  that the photograph is actually adjacent to the headline.  It's

11  not just a regular embed.

12      I'm assuming that your Honor knows what the embed is

13  from Judge Forrest's decision and stuff.

14      THE COURT:  And even before that, but yes.

15      MR. FREEMAN:  And you knew before that.  So this is

16  not an embed.  Exhibit B does not look anything like resembling

17  an embed.  It looks like it was -- the photograph was download

18  and re-uploaded or reformatted and affixed to or adjacent to

19  the headline.

20      So I think on the transformative use, they don't

21  really stand a chance, because, again, I mean, one of the

22  things I always analyze in terms of fair use in the

23  transformative factor is whether or not the photograph was

24  necessary to the message that's being conveyed, and if the

25  photograph is interchangeable, it could have been any picture

1  of Rachel Dolezal.  Like, you didn't even really need it, so

2  you are just exploiting it for the sake of exploiting it

3  because it is accessible to you and the defendant wanted to,

4  you know, save itself the time and expense of obtaining its own

5  photograph either through a license or by photographing Ms.

6  Dolezal through its own news-gathering ability.  So, I mean, we

7  don't see how this is in any way, shape or form transformative.

8          And with respect to the fourth factor, Polaris is a

9  commercial licensing agency.  So to say that there is no market

10  for it, that certainly creates a question of fact.  But putting

11  that aside, the law is pretty clear that, you know, once a

12  commercial entity takes a photograph and exploits it for

13  profit, there is a presumption that there is market harm,

14  particularly where the secondary use involves a photocopy,

15  right.  And this is just an exact photocopy; they haven't done

16  anything transformative to it.

17          So once you lose the first, the fourth factor sort of

18  collapses onto itself.

19          With respect to the -- you know, one of the

20  interesting things about premotion conferences, as your Honor

21  noted, is it gives the defendant an opportunity to understand

22  the potential weaknesses of the motion.  So the Court says,

23  look, I can't stop you from making the motion, but there is

24  sort of an undercurrent or implication that it is discouraged

25  to make the motion.  And sometimes we have situations where the

1    defendant makes the motion anyway.  And, you know, one of the

2    things that we have been contemplating is when you make a Rule

3    12 motion, it does delay the proceeding.  I mean, granted,

4    we're not sure how fast your Honor would rule, but we tend to

5    estimate it is like a six- to nine-month delay in the

6    proceeding.  So if defendant is going to move forward and make

7    a motion which it has already admitted it is unlikely to

8    proceed --

9              THE COURT:  They didn't say that.

10             MR. FREEMAN:  There should be -- you know, we would

11   consider, you know, making a cross motion for our fees to

12   prepare that opposition brief.

13             THE COURT:  I will express my skepticism about your

14   ability to recover fees, if there is skepticism you are looking

15   for.

16             Let me ask you a different question, sir.  One thing

17   that we -- and by "we" I mean myself and defense counsel -- are

18   missing is the date of the exclusive license agreement.  I

19   don't believe it is in your complaint.  It may or may not have

20   significance to the argument sort of being made by defense

21   counsel.

22             Either with respect to that fact or with respect to

23   any other fact, do you wish to amend your complaint?  Because

24   as you know, what I want to do is I want to prevent the

25   situation where there is some thoughtful motion opening brief

1    filed and then you respond with a proposed amended complaint

2    and there didn't need to be that thoughtful opening brief in

3    the first instance.

4         So, I will give you the opportunity to amend if you

5    would like that opportunity.

6         MR. FREEMAN:  Yes, we would.

7         THE COURT:  Tell me, please, about how much time would

8    you like, within reason?

9         MR. FREEMAN:  Let's say 21 days.

10        THE COURT:  All right.  Just to make it easier for me,

11   January 10th, sir?

12        MR. FREEMAN:  Yes.  Thank you, your Honor.

13        THE COURT:  January 10th.  OK.

14        And before I return to Mr. Tauler, is there anything

15   else you would like me to know, sir?

16        MR. FREEMAN:  No.  Thank you, your Honor.

17        THE COURT:  Thank you very much.

18        Mr. Tauler, so we're going to give plaintiff's counsel

19   an opportunity to amend because that's the fairest thing to do.

20   I don't know that you would know at this time whether you would

21   feel as strongly about the desire to move to dismiss the

22   amended complaint, especially because you haven't seen it yet,

23   but I guess I'm going to ask you this question because this is

24   the judge in me asking this question:  Given the resources

25   needed for a motion to dismiss, is it your will or your wish

1    and your client's wish to use those resources for the motion as

2    opposed to settling the matter?  If the answer is yes, that is

3    fine by me.  I just want to know.

4           MR. TAULER:  I think you are of course correct that I

5    don't know the future.  However, I have my inclination and I

6    could say with a great of confidence that the likelihood is

7    that we would pursue the motion.

8           THE COURT:  OK.  Then that is fine.

9           Sir, when you receive on or before January 10th the

10   amended complaint, could you let me know within two weeks --

11   that would be January 24th -- whether it is your interest to

12   move or to file an answer?  And I will schedule something as

13   soon as I get -- as soon as I get your letter.  Your letter

14   could be earlier than the 10th, but once I get a sense of what

15   it is you wish to do, I will set a schedule.  Please understand

16   that it probably won't be an especially long schedule because

17   we have had this time and you've already sort of thought about

18   your ideas, and you now know, for what it's worth, that there

19   may be a cross motion as well.

20          I will say this.  I don't prejudge, because that seems

21   to be foolish, and as much as I prepare for these conferences,

22   I don't come with the complete body of knowledge committed to

23   memory.  I've already discussed with you some of the

24   vulnerabilities that I see to some of your arguments, and I

25   think some of those vulnerabilities may be intensified by an

1    amended pleading, but if I really believed it was a fruitless

2    effort and a waste of time, I hint more strongly than I

3    currently am.  I simply don't know.

4         I do think the Instagram issue is interesting from an

5    intellectual perspective.  The other two, yeah, I don't think

6    your fair use is a win but, who knows, stranger things have

7    happened.

8         I was somewhat glib with Mr. Freeman.

9         I don't think your motion as currently contemplated is

10   so ridiculous that I would be imposing costs, but also, again,

11   I can't say because I haven't seen their amended complaint.  It

12   might -- I might be persuaded if they really shore up some of

13   the deficiencies you've been discussing.  But that's why you

14   need time to think about these things and just to discuss it

15   with your client.

16        I will ask you, sir, because it is you who is

17   contemplating a motion to amend -- excuse me, a motion to

18   dismiss, that you obtain a transcript of this conference in the

19   ordinary course.  If you do so, I'll receive it automatically

20   and I will have it when I have the amended complaint and the

21   briefing.

22        But while I have you standing, are there things that

23   you want to say in reply or other things that you would like me

24   to know?

25        MR. TAULER:  No, your Honor.  We will look carefully

Jcjdpolc

1    at the fair use argument, and if it turns out it lacks
2    probability, given the Court's position, we simply won't make
3    that argument.
4              THE COURT:  OK.
5              MR. TAULER:  So we will look at every issue carefully
6    before we file it.
7              THE COURT:  I appreciate that.  Thank you very much.
8              Mr. Freeman, is there anything else you would like me
9    to know today?
10             MR. FREEMAN:  Not for plaintiff, your Honor.
11             THE COURT:  OK.  Mr. Liebowitz, anything you want to
12   add?
13             MR. LIEBOWITZ:  Nothing.
14             MR. TAULER:  Thank you, your Honor.
15             THE COURT:  All right.  Thank you very much.  We are
16   adjourned.  Happy holidays to all.
17             MR. FREEMAN:  Happy holidays.
18             (Adjourned)
19
20
21
22
23
24
25